813 So.2d 548 (2002)
Marion WILLIAMS and Charles Williams
v.
Martin O'NEILL, M.D., Richard Vallette, M.D., Robert Morales, M.D., H.D. Taylor, M.D., New Orleans Radiology Group, Hamilton Bruni, M.D., F. Thompson, M.D., State of Louisiana through the Louisiana State Medical Center, et al.
In re Medical Review Panel for the Claim of Marion Williams and Charles Williams.
Marion Williams and Charles Williams
v.
Martin O'Neill, M.D., Richard Vallette, M.D., Robert Morales, M.D., H.D. Taylor, M.D., New Orleans Radiology Group, Hamilton Bruni, M.D., F. Thompson, M.D., State of Louisiana through the Louisiana State Medical Center, et al.
Nos. 99-CA-2575, 99-CA-2576, 99-CA-2577.
Court of Appeal of Louisiana, Fourth Circuit.
March 13, 2002.
Writ Denied May 24, 2002.
*551 Michael C. Ginart, Jr., Law Office of Tonry & Ginart, Chalmette, LA, for Plaintiffs/Appellants.
Richard P. Ieyoub, Attorney General, Susan H. Lafaye, Assistant Attorney General, Department of Justice, New Orleans, LA, for R. Fulton Thompson, M.D.
Bruce A. Cranner, Frilot, Partridge, Kohnke & Clements, New Orleans, LA, for Intervenor, The Louisiana Patient's Compensation Fund.
*552 (Court composed of Judge JOAN BERNARD ARMSTRONG, Judge STEVEN R. PLOTKIN, Judge TERRI F. LOVE).
PLOTKIN, Judge.
Among other things, the instant case presents the novel issue of whether plaintiffs in a medical malpractice action may recover damages up to the amount of two medical malpractice "caps" when their damages were caused both by the negligence of a health care provider qualified under the Medical Malpractice Act ("MMA"), LSA-R.S. 40:1299.40 et seq., and by a health care provider whose liability falls under the provisions of the Medical Liability for State Services Act ("MLSSA"), LSA-R.S. 40:1299.39.
Defendant, Dr. R. Fulton Thompson, and intervenor, the Louisiana Patient's Compensation Fund, appeal a trial court judgment in favor of plaintiffs, Marion and Charles Williams, awarding the Williamses a total of $500,000 for damages resulting from medical malpractice related to treatment rendered to Mrs. Williams. The Williamses have filed a cross-appeal. We affirm.

I. FACTS
Mrs. Williams, who was 68 at the time, underwent coronary bypass surgery performed by Dr. Martin O'Neill and Dr. Richard Vallette at Lakeland Hospital in New Orleans on April 23, 1993. Dr. Richard Watson served as staff anesthesiologist in charge during the surgery, while Dr. R. Fulton Thompson, Louisiana State University second-year anesthesia resident in training, actually inserted a triple lumen catheter and a Swans-Ganz catheter into Mrs. Williams' circulatory system immediately prior to surgery. Following the surgery, the catheter guide wire used by the anesthesiologists was left in Mrs. Williams' blood vessels.
In May of 1993, Mrs. Williams began to experience pain in her leg. Mrs. Williams consulted her physician, Dr. Hamilton Bruni, at that point. Dr. Bruni recommended the performance of an ultrasound because he suspected that Mrs. Williams might have a blood clot; however, Mrs. Williams refused that procedure. Almost nine months after the surgery, on January 19, 1994, Mrs. Williams consulted Dr. Allain Cracco, an orthopedist, who took x-rays of Mrs. Williams' leg. Those x-rays revealed the existence of several pieces of guide wire that had apparently been left in Mrs. Williams following the bypass surgery. The two-foot braided three-piece wire had unraveled and fragmented, traveling to three different locations inside Mrs. Williams' body.
On Dr. Cracco's recommendation, Mrs. Williams went to see her cardiologist, Dr. Tampiro, who reviewed the x-rays from her original hospital stay after the surgery and referred her to her cardio-surgeon, defendant Dr. O'Neill. However, Mrs. Williams was unable to obtain an appointment with Dr. O'Neill until Thursday, January 27, 1994. In the interim, during the early morning hours of January 27, one of the guide wires broke through Mrs. Williams' skin, causing her to awaken in great pain. At that point, Mr. Williams rushed his wife to Humana Hospital, where Mrs. Williams was forced to undergo major surgery to remove the fragments of the guide wire. Incisions were made in three locations to remove approximately six feet of guide wire that was in three sections.
The Williamses filed a medical malpractice complaint against a number of defendants. Following a decision by the Medical Review Panel, the Williamses filed three separate suits, which were ultimately *553 consolidated by the trial judge. The Williamses sued Dr. Thompson and the State of Louisiana through the Louisiana State Medical Center/School under the MLSSA, and the other defendants under the MMA. Although numerous defendants were originally named, the Williamses settled with and/or dismissed many of the defendants either before or during trial, and at least one defendant was released by summary judgment. As a result, the only defendants at trial were Dr. Thompson, the anesthesiology resident and the State of Louisiana, sued under the MLSSA; Dr. Watson, staff anesthesiologist and the Louisiana Insurance Guaranty Ass'n ("LIGA"), which had been substituted for Dr. Watson's insolvent insurer, under the MMA. On November 24, 1998, the jury returned a verdict awarding the following damages to the Williamses:

MARION WILLIAMS DAMAGES:
Past Medical Expenses $ 38,405.95
Past Physical Pain & Suffering $ 350,000.00
Past, Present, & Future Mental Anguish and
Distress $ 350,000.00
Permanent scarring $ 150,000.00
 _____________
TOTAL DAMAGES $ 888,405.95
CHARLES WILLIAMS DAMAGES:
Loss of Consortium $ 50,000.00
Mental Anguish $ 150,000.00
 _____________
TOTAL DAMAGES $ 200,000.00
TOTAL DAMAGES AWARDED TO MARION
WILLIAMS AND CHARLES WILLIAMS $1,088,405.95

Liability was apportioned as follows by the jury:
Dr. Thompson and the State of Louisiana through the
 Louisiana State Medical Center/School 35 percent
Dr. Watson 50 percent
Dr. Morales 5 percent
Dr. Taylor 5 percent
Dr. O'Neill 5 percent
By written judgment dated December 7, 1998, the trial court entered judgment on the jury's verdict against Dr. Thompson, the State of Louisiana, Dr. Williams, and LIGA in solido for $1,088,405.95 plus interest from date of judicial demand, subject to a 15 percent credit on the principal for the liability of the dismissed and/or settled defendants, Dr. Morales, Dr. Taylor, and Dr. O'Neill. Following defendants' post-trial motions, the trial court reduced the judgment to $500,000, the maximum damages that may be awarded to medical malpractice plaintiffs under both the MLSSA or the MMA, plus interest and costs.
The LPCF intervened in this matter and filed a devolutive appeal. Dr. Watson and LIGA entered into a "Receipt, Release and Indemnity Agreement" with the Williamses for $100,000, plus interest and costs. Dr. Thompson filed a timely appeal, and the Williamses filed a cross appeal.

II. APPLICATION OF TWO DIFFERENT MEDICAL MALPRACTICE

"CAPS"
As previously noted, the Williamses seek recovery under both the MLSSA, which *554 establishes the rules for bringing a medical malpractice action against Dr. Thompson and the State of Louisiana, and the MMA, which establishes the rules for bringing a medical malpractice suit against all of the other defendants in this case. Both the MLSSA and the MMA contain provisions limiting a medical malpractice claimant's recovery to $500,000. LSA-R.S. 40:1299.39(F); LSA-R.S. 40:1299.42. The trial court reduced the $1,088,405.95 judgment awarded by the jury to the Williamses to a single $500,000 cap.
In their cross appeal, the Williamses assert that the trial court should not have reduced the award to a single cap, but should have held that they are entitled to recovery up to $500,000 under the MLSSA for the liability of Dr. Thompson and the State of Louisiana, and up to $500,000, less the $100,000 paid by Dr. Watson, under the MMA for the liability of Dr. Watson. In support of this argument, the Williamses cite this court's decision in Johns v. Agrawal, 99-0499 (La.App. 4 Cir. 11/17/99), 748 So.2d 514.
In Johns, the plaintiffs filed suit against a number of health care providers who allegedly failed to diagnosis their decedent's renal cell carcinoma in a timely fashion. Among the defendants were the Veterans' Administration Medical Center ("VA"), Tulane University Medical Center ("TUMC"), Dr. Naurang Agrawal, and Dr. Francisco Jaramillo. Eventually, the claims against the VA were tried in federal court, separately from the claims against the other defendants who remained defendants in a state court action. Eventually, the federal court entered a judgment in favor of the plaintiffs against the VA in the amount of $500,000. Following the judgment in the federal court action, the defendants in the state court action filed an exception of no right of action and a motion for partial summary judgment, arguing that the plaintiffs were precluded by the MMA from seeking further damages because they had received $500,000, the amount of the medical malpractice cap under the MMA, from the VA. Id. at 4, 748 So.2d at 517. The trial court granted the exception and motion for summary judgment, finding that the plaintiffs were not entitled to further recovery. Id.
The plaintiffs appealed, citing LSA-R.S. 40:1299.41(D), which provides, in pertinent part, as follows:
A health care provider who fails to qualify under this Part is not covered by the provisions of this Part and is subject to liability under the law without regard to the provisions of this Part. If a health care provider does not so qualify, the patient's remedy will not be affected by the terms and provisions of this Part.
(Emphasis added.) Because the VA failed to qualify under the MMA, the Johns plaintiffs argued that the medical malpractice cap did not affect their ability to recover against the defendants in the state court action. This court agreed, stating as follows:
We thus find that under R.S. 40:1299.41 D, a patient's recovery of damages from a non-qualified provider does not affect the remedy available against a qualified health care provider, which remains subject to the limitations of the Medical Malpractice Act. Because these plaintiffs have received no monies from any qualified health care provider nor the PCF, neither R.S. 40:1299.42 B(1) nor R.S. 40:1299.42 B(2) deprives them of their right and cause of action against these defendants.
Id. at 11, 748 So.2d at 521. Thus, this court held in Johns that the $500,000 cap established by the MMA does not prevent recovery of that amount from health care providers qualified under the act, while, at *555 the same time, recovering from health care providers whose liability is not controlled by the MMA.
In the instant case, Dr. Watson is a qualified health care provider under the MMA, but the liability of Dr. Thompson and the State of Louisiana is not controlled by the MMA. Nevertheless, we find that the instant case is not analogous to the Johns case because of two clear factual distinctions. The first distinction is found in the fact that the Johns case involved two sets of health care providers, both sets of which had failed to timely diagnosis the decedent's fatal illness. When two health care providers both fail to diagnose an illness, Louisiana courts have found that two separate acts of negligence were committed, one by each health care provider. Turner v. Massiah, 94-29, p. 14 (La.App. 5 Cir. 7/1/94), 641 So.2d 610, 620. Further, it is well settled in Louisiana law that a medical malpractice plaintiff may recovery damages equal to two medical malpractice "caps" when two separate acts of medical malpractice by two different health care providers converge to cause the plaintiff's injuries, regardless of whether the liability of the health care providers is controlled by the MLSSA or the MMA. Batson v. South Louisiana Medical Center, 99-0232 (La.11/19/99), 750 So.2d 949, and the cases cited therein. The plaintiffs in Johns would have been entitled to recover damages equal to two medical malpractice caps even if the liability of all of the defendants had been controlled by the MMA. However, in the instant case, only one act of medical malpractice occurredi.e., the failure to remove the guide wire.
The second distinction between this case and the Johns case is that all of the defendants herein are protected by limitations of liability specifically set forth in Louisiana statutory provisions governing medical malpractice actions. In the Johns case, the VA was not a qualified health care provider under the MMA, nor was it covered by the MLSSA, and it was not expressly entitled to the protections of either of those provisions.[1] However, all of the defendants herein are entitled to those protections. Accordingly, we find that the result in Johns does not control the instant case.
We are therefore faced with an important res nova issue under Louisiana medical malpractice lawi.e., whether a plaintiff may be allowed to collect damages equal to two medical malpractice caps for a single act of medical malpractice committed by two health care providers, one whose liability is controlled by the MMA and one whose liability is controlled by the MLSSA. Determination of that issue involves two competing policy considerations. First, we are cognizant of the vast body of jurisprudence relative to the fact that Louisiana's medical malpractice acts "must be strictly construed because they grant immunities or advantages to special classes in derogation of the general rights available to tort victims." Kelty v. Brumfield, 93-1142, p. 9 (La.2/25/94), 633 So.2d 1210, 1216, and the cases cited therein. Second, we must acknowledge the fact that the legislature intended by its adoption of the medical malpractice acts to "impose significant limitations on the courts' power and authority to adjudicate medical negligence cases, viz., (1) a comprehensive *556 $500,000 cap on damages; ... and (2) mandated medical review before trial." Id.
Ultimately, Louisiana courts are required to "treat legislation as the solemn expression of legislative will, and therefore, interpretation of a law involves primarily the search for the legislature's intent." Batson, 99-0232 at 9, 750 So.2d at 956. Accordingly, "[w]hen a law is clear and unambiguous and its interpretation does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature." Id. We must therefore look to the language of the respective statutory provisions establishing the $500,000 cap on damages under Louisiana's two medical malpractice acts.
The arguments made by the Williamses in the instant case, since they are based on Johns, focus on the language of the MMA indicating that the cap does not apply to a "health care provider who does not qualify" under that provision, and that such a health care provider is therefore "subject to liability under the law without regard to the provisions" of the MMA. LSA-R.S. 40:1299.42. The Williamses place much emphasis on the following language: "If a health care provider does not so qualify, the patient's remedy will not be affected by the terms and provisions of this Part." Id.
However, this court must consider the language of both acts in order to decide the question presented by this appeal, not just the language of the MMA. In fact, we note that the MMA was originally adopted in 1975, while the MLSSA was originally adopted in 1977. Since the MLSSA is the more recent expression of the legislative will, its express language should therefore control. The limitation of liability provision of the MLSSA states as follows:

Notwithstanding any other provision of the law to the contrary, no judgment shall be rendered and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged act of malpractice in excess of five hundred thousand dollars plus interest and costs, exclusive of future medical care and related benefits valued in excess of such five hundred thousand dollars.
(Emphasis added.) On the basis of the emphasized language above, we find that the intent of the legislature when it adopted the MLSSA was to limit a medical malpractice plaintiffs recovery to a single $500,000 cap for a single act of medical malpractice by health care providers entitled to protection under the two Louisiana medical malpractice acts, even if the liability of some is controlled by the MMA and the liability of others is controlled by the MLSSA. Accordingly, we find that the trial court properly limited the Williamses recovery to a single $500,000 medical malpractice cap.

III. LIABILITY OF LPCF
The LPCF argues that it cannot be held liable for any damages levied against any of the settling health care providers in this case, because the Williamses failed to provide proper notice of settlement, as required by LSA-R.S. 40:1299.44(C). That statute provides, in pertinent part, as follows:
C. If the insurer of a health care provider or a self-insured health care provider has agreed to settle its liability on a claim against its insured and claimant is demanding an amount in excess thereof from the patient's compensation fund for a complete and final release, then the following procedure must be followed:

*557 (1) A petition shall be filed by the claimant with the court in which the action is pending against the health care provider, if none is pending in the parish where plaintiff or defendant is domiciled seeking (a) approval of an agreed settlement, if any, and/or (b) demanding payment of damages from the patient's compensation fund.
(2) A copy of the petition shall be served on the board, the health care provider and his insurer, at least ten days before filing and shall contain sufficient information to inform the other parties about the nature of the claim and the additional amount demanded.
A study of the relevant jurisprudence interpreting LSA-R.S. 40:1299.44(C) reveals the following rules. A medical malpractice claimant seeking recovery from the LPCF is unquestionably subject to the notice requirements set forth in LSA-R.S. 40:1299.44(C) if he or she has settled with a covered health care provider for $100,000 prior to trial. Horil v. Scheinhorn, 95-0967 (La.11/27/95), 663 So.2d 697; Castille v. Our Lady of Lourdes Regional Medical Center, 96-1476 (La.App. 3 Cir. 4/2/97), 692 So.2d 1303. However, the rule established by Horil and Castille does not apply when a medical malpractice claimant has settled with a covered health care provider for less than $100,000. In such a case, the applicable rule is set forth in Giammanchere v. Ernst, 96-2458 (La.App. 4 Cir. 5/19/99), 742 So.2d 572.
However, the question raised by the instant appeal is not resolved by reference to any of the above rules. The Williams have conceded that they are not entitled to recover any excess damages from the LPCF for the liability of Dr. Morales, Dr. Taylor, or Dr. O'Neill, with whom they settled prior to trial. The basis for the Williamses' claim for excess damages from the LPCF is the trial court judgment against Dr. Watson, to whom the jury assigned 50 percent of the liability. Although Dr. Watson entered into a "Receipt, Release and Indemnity Agreement" ("release agreement") with the Williamses for a total of $100,000 plus interest and costs, that agreement occurred after the conclusion of the trial. This case is therefore clearly distinguishable from Horil, Castille, and Giammanchere, in which the plaintiffs settled with the qualified health care providers prior to trial. This case is also further distinguishable from Giammanchere, because the settlement in that case was for less than $100,000. We find that those distinctions require a different rule.
The release agreement that the Williamses and Dr. Watson entered after the trial court judgment in this matter states, in pertinent part, as follows:
It is further understood and agreed that this payment represents full and complete satisfaction of all obligations of the "LIGA" and Richard Watson, M.D. pursuant to the Judgment and all claims against LIGA and Richard Watson, M.D. pursuant to the Judgment are hereby expressly RELEASED.
(Emphasis added.) That language reveals that the release agreement was not a typical "settlement," as the LPCF argues, but a payment in satisfaction of Dr. Watson's portion of the judgment against him. Thus, the issue raised by the instant appeal is whether the notice requirements set forth in LSA-R.S. 40:1299.44(C) apply when the health care provider has entered a release agreement in satisfaction of a trial court judgment against him, after the entry of judgment following a trial on the merits.
Although that issue has apparently never been specifically addressed, in Dawes v. Kinnett, 99-3157, 99-3158, 99-3159 *558 (La.App. 4 Cir. 01/17/01), 779 So.2d 978, this court found that a $135,000 payment made by a health care provider in satisfaction of judgment after the trial was not a "settlement" for purposes of LSA-R.S. 40:1299.44(C). Id. at 7, 779 So.2d at 982. Thus, this court has already held that LSA-R.S 40:1299.44(C) has no application to post-trial satisfactions of judgment, such as the agreement between Dr. Watson and the Williams in this case. We hold therefore that a plaintiff who accepts a payment in satisfaction of a trial court judgment from a defendant health care provider in a medical malpractice case is not required to satisfy the notice requirement established by LSA-R.S. 40:1299.44(C) prior to seeking further recovery from the LPCF. Accordingly, we find no merit in the LPCF's arguments based on LSA-R.S 40:1299.44(C).

IV. QUANTUM
Both the LPCF and Dr. Thompson assert that the trial court awarded excessive general damages for Mrs. Williams' past physical pain and suffering; past, present, and future mental anguish and distress, and permanent scarring. The LPCF and Dr. Thompson also allege that the trial court improperly awarded general damages for Mr. Williams' mental anguish and loss of consortium.
"Consideration of the jury's determination of damages is limited to a review for abuse of discretion on appeal." Coleman v. Deno, 99-2998, p. 41 (La.App. 4 Cir. 4/25/01), 787 So.2d 446, 475. "The discretion vested in the trier of fact is `great,' and even vast, in determining the amount of damages." Id., citing Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, sub nom. Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Under the provisions of La. C.C. art.1999, much discretion is left to the court for the reasonable assessment of damages that are insusceptible of precise measurement. Coleman, 99-2998 at 41, 787 So.2d at 475. The particular injuries and their effects on the particular injured persons must first be examined by the appellate court. Id. The court may resort to a comparison of prior awards in similar cases only after determining that the trial court committed an abuse of discretion. Id. The only appropriate use of prior awards is for the purpose of determining the highest or lowest point that is reasonably within that discretion. Id.
Concerning general damages, this court stated as follows in Coleman:
General damages involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors that affect the victim's life. Delphen v. Department of Transp. and Development, (La.App. 4 Cir. 5/24/95), 657 So.2d 328, writ denied, 95-2116 (La.11/17/95), 663 So.2d 716, and writ denied, 95-2124 (La.11/17/95), 663 So.2d 717. The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific. The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir.1991).
Id.

A. Mrs. Williams' general damages
The trial court awarded Mrs. Williams a total of $850,000 in general damages, broken down as follows: past physical pain & suffering$350,000; past, present, and *559 future mental anguish and distress $350,000; and permanent scarring $150,000. As part of their argument that the trial court abused its vast discretion in awarding general damages to Mrs. Williams, the LPCF and Dr. Thompson summarize the facts as follows: Mrs. Williams initially identified the pain caused by the guide wire as her usual arthritis, indicating that it was not more severe than the pain ordinarily experienced by Mrs. Williams. Once discovered, Mrs. Williams's problem was corrected with one surgery, which required only a one-month convalescence period. She has no residual injuries, and her scarring is neither unusually disfiguring or located on a noticeable part of her body. Dr. Thompson and LPCF also assert that Mrs. Williams failed to properly mitigate her damages because she failed to have the ultrasound recommended by Dr. Bruni.
The Williamses claim, however, that all of the damage awards to Mrs. Williams are reasonable given the trial court's great discretion in the matter, as well as the profound effect the incident had on their family. The particular consequences to these particular plaintiffs under these particular circumstances requires that the trial court's awards be affirmed, they assert. Their arguments may be summarized as follows: Mrs. Williams suffered great, unexpected pain when the guide wire broke through her skin in the middle of the night. Her husband both heard her scream and saw the wire protruding from her knee. Moreover, she suffered great distress after finding out about the presence of the guide wires, and during the procedure to remove them. Mrs. Williams also has three scars six to eight inches long. Concerning Mrs. Williams' alleged failure to mitigate damages, the Williamses claim that no evidence was presented at trial that the ultrasound suggested by Dr. Bruni would have discovered the wires.
Our review of the evidence presented at trial in this matter reveals no abuse of the trial court's great discretion on this matter. The testimony of both Mr. Williams and Mrs. Williams, as well as the testimony of their son, John Williams reveals that the medical malpractice at issue in this case had profound effects on Mrs. Williams.
Concerning Mrs. Williams' past physical pain and suffering, she testified that she first noticed a pressure pain in her leg about three weeks after the bypass surgery. That pain was present anytime she walked or moved around. Mrs. Williams was told by her doctors that she needed to walk as part of her recovery, so she and Mr. Williams walked every morning, going further every day. The pain became steadily worse, and eventually became more of a sticking and/or burning sensation. Mrs. Williams experienced this pain for the entire nine-month period between the two surgeries.
Moreover, Mrs. Williams testified that she suffered great pain when the wire poked through her skin. She was then immediately hospitalized, and several attempts were made to retrieve the wires by a number of different health care professionals, to no avail. Ultimately, Mrs. Williams was forced to undergo additional surgical procedures to retrieve the wires, resulting in three significant scars. She was then unable to participate in many of the routines of her life for some four to six weeks. Mrs. Williams' testimony concerning her past physical pain and suffering was corroborated by Mr. Williams. Based on this evidence, we find no abuse of the jury's vast discretion in awarding Mrs. Williams $350,000 for past physical pain and suffering.
*560 Not only did Mrs. Williams experience physical pain and suffering related to the presence of the guide lines, she also suffered mental anguish and distress after learning the cause of the physical pain, not the least of which was her concern about the consequences the wires might have had, had they not been discovered. Moreover, between the day that she learned of the presence of the wires and the night the wire poked through her skin, Mrs. Williams suffered mental anguish and distress relative to the possible consequences that might yet occur.
However, Mrs. Williams' great concerns about the possible consequences of the presence of the guide wires apparently did not initially include the exact result that occurredi.e., the fact that the wire might unexpectedly poke through Mrs. Williams' skin, waking her in the middle of the night. Mrs. Williams testified that she screamed when she saw the wire sticking out of her knee. Moreover, Mrs. Williams watched the retrieval attempts on the monitor until it became too hard to watch, worrying all the time about what might happen.
However, the record reveals that perhaps the most mentally and emotionally distressing aspect of the entire incident for Mrs. Williams the fact that she was unable to attend the wedding of her youngest son, John, which occurred the day after she woke up with the wire sticking out of her knee. Mrs. Williams described in great detail her feelings about being forced to miss John's wedding. Moreover, John testified to his great distress caused by his mother's absence, as well as his concern for her health on that most special day of his life.
We also find that Mrs. Williams continues to suffer mental anguish and distress, and will continue to suffer mental anguish and distress as a result of the malpractice. Mrs. Williams testified of her fear of doctors and hospitals, despite the fact that she needs medical care and treatment for her diabetic condition. Mr. Williams also testified to Mrs. Williams' reaction whenever she passes a hospital in a vehicle. On the basis of this evidence, we find no abuse of the jury's vast discretion in awarding Mrs. Williams $350,000 in past, present, and future mental anguish and distress.
Finally, Mrs. Williams testified that she has three significant scarsone across the bottom of her stomach, one on her thigh, and one on the side of her knee. The jury was also shown pictures of those scars and was in the best position to determine their severity, as well as their effect on Mrs. Williams. Thus, we find no abuse of the jury's vast discretion in awarding Mrs. Williams $150,000 for permanent scarring.
We also agree with the Williamses that the record is devoid of evidence to indicate that Mrs. Williams' failure to submit to the ultrasound suggested by Dr. Bruni when she first started experiencing pain should be considered a failure to mitigate damages. Nothing in the record indicates that the ultrasound, which Dr. Bruni ordered solely because he thought that Mrs. Williams might be suffering from blood clots, would have discovered the presence of the guide wires. We also note that, as we have found no abuse of the jury's vast discretion in this matter, consideration of the numerous cases cited by Dr. Thompson and the LPCF would be inappropriate. Coleman, 99-2998 at 41, 787 So.2d at 475. Accordingly, we find no merits in any of the arguments presented by LPCF and Dr. Thompson relative to Mrs. Williams' general damages. Accordingly, the trial court judgment awarding Mrs. Williams $850,000 in general damages is hereby affirmed.

*561 Mr. Williams' general damages
Concerning Mr. Williams' general damages, the LPCF and Dr. Thompson claim that Mr. Williams failed to prove the elements necessary to recover mental anguish damages caused by injury to a third party, and that he is not entitled to loss of consortium damages because he only lost Mrs. Williams' services for a brief period during her convalescence from the second surgery.
Determination of whether a third party to an event is entitled to recover damages for mental injury is controlled by La. C.C. art. 2315.6[2], which states as follows:
A. The following persons who view an event causing injury to another person, or who come upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury:
(1) The spouse, child or children, and grandchild or grandchildren of the injured person, or either the spouse, the child or children, or the grandchild or grandchildren of the injured person.
(2) The father and mother of the injured person, or either of them.
(3) The brothers and sisters of the injured person or any of them.
(4) The grandfather and grandmother of the injured person, or either of them.
B. To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article.
A trial court's decision to award a plaintiff damages for mental or emotional anguish or distress under the provisions of La. C.C. art. 2515.6 is a finding of fact that should not be disturbed in the absence of a finding of manifest error. Labouisse v. Orleans Parish School Board, 99-1684, p. 7 (La.App. 4 Cir. 3/15/00), 757 So.2d 866, 871. In order to recover under La. C.C. art. 2315.6, a plaintiff must establish the following elements: (1) the plaintiff "either viewed the accident or injury-causing event or came upon the accident scene soon thereafter and before substantial change occurred in the victim's condition;" (2) "the `direct' victim of the traumatic injury suffered such harm that it can reasonably be expected that one in the plaintiff's position would suffer serious mental anguish from the experience"; (2) "the plaintiff's emotion distress was reasonably foreseeable and `both severe and debilitating'"; and (4) "the plaintiff shared a close relationship to the injured person such that the plaintiffs shock was understandable." Declouet v. Orleans Parish School Board, 96-2805, p. 19 (La. App. 4 Cir. 6/3/98), 715 So.2d 69, 79.
The accident or injury-causing event for which Mr. Williams seeks mental anguish damages encompassed both the night the guide wire poked through Mrs. Williams' skin, and the subsequent medical treatment, including the second surgery, that was necessary to remove the guide wires and repair the injury. Concerning the first element for recovery of mental anguish damages quoted above, the record *562 indicates that Mr. Williams was awakened by his wife's scream when the guide wire poked through her skin and that he then both saw the wire and was either a direct or indirect witness to the subsequent medical treatment, including the efforts of a number of medical personnel to remove the wire poking through the skin without surgery.
Concerning the second element for recovery of third-party mental anguish damages, the extent of the harm suffered by Mrs. Williams was so severe that it could reasonably be expected that her husband would suffer severe mental anguish as a result of the experience. Concerning the third element, Mr. Williams' injury was as a result of the unusual nature of the injury-causing event to his wife was both reasonably foreseeable and both severe and debilitating. Mr. Williams stated at trial that he was extremely worried during the entire course of the subsequent treatment procedures, and especially during the surgery, that he would loss his wife of 50 years. This concern was particularly debilitating for him because it was the second time in a nine-month period that he was faced with that possibility. Concerning the fourth element of the above test, Mr. Williams, as a spouse, is clearly one of the persons entitled under the provisions of La. C.C. art. 2315.6 to recovery damages for mental anguish suffered by another person under some circumstances. Accordingly, we find no manifest error in the trial court judgment awarding Mr. Williams $150,000 for mental anguish.
Concerning Mr. Williams's loss of consortium claim, the record evidence indicates that Mrs. Williams had been a homemaker the entire length of her 50 year marriage to Mr. Williams. Mrs. Williams did all the cooking and cleaning. During Mrs. Williams' convalescence period, Mr. Williams not only was forced to perform all of the household chores, but he was also responsible for all of Mrs. Williams' care. Mrs. Williams testified that she could not do anything for at least a month to six weeks, then slowly started adding some activities.
"Loss of consortium includes such elements as loss of service, loss of love and affection, loss of society and companionship, loss of sexual relationship, loss of support and loss of felicity or overall contentment and happiness." Coleman, 99-2998 at 39, 787 So.2d at 473. Based on the above testimony, we find no abuse of the jury's vast discretion in awarding Mr. Williams $50,000 for his loss of consortium. Accordingly, the trial court judgment awarding Mr. Williams $50,000 in damages of his loss of Mrs. Williams' consortium is hereby affirmed.

V. CONCLUSION
The trial court judgment is affirmed.
AFFIRMED.
NOTES
[1] The liability of the VA was limited to $500,000 in Johns because the federal court determined that it was entitled to the benefit of Louisiana's cap on damages of medical malpractice under Owens v. United States, 935 F.2d 734 (5th Cir.1991), cert. denied, 502 U.S. 1031, 112 S.Ct. 870, 116 L.Ed.2d 775 (1992). However, the VA was not expressly entitled to the protections of Louisiana medical malpractice acts, as are all of the defendants in the instant case.
[2] Dr. Thompson and the LPCF cite Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La. 1990), for the standard controlling this issue. However, the principles set forth in Lejeune have been codified in La. C.C. art. 2315.6.