CHARLES R. JONES, Judge.
|, The Appellants, plaintiffs Toni Wansley and Robert Selleck, on behalf of their minor son Taylor Ashtyn Wansley (hereinafter the “Appellants”), appeal the granting of a motion for summary judgment in favor of the Appellees, defendants University Healthcare System, LC., d/b/a Tulane Hospital and Clinic, Tulane Hospital for Children, as part of Tulane University Hospital and Clinic, and Health Care Indemnity, Inc. (“TUHC”). Finding that the Appellants cannot establish that there is a genuine issue of material fact as to whether they can carry their burden of proof at trial, we affirm the judgment of the district court.
This is a medical malpractice lawsuit. The Appellants, the parents of the minor Ashtyn Wansley, are suing — individually and on behalf of their minor son — TUHC, as well as other healthcare providers affiliated with TUHC, for alleged negligent post-surgical treatment rendered to their son. Ashtyn, who was eight (8) years old at the time of his July 2000 surgery, had Factor VIII hemophilia, which is a largely inherited disorder in which one of the proteins needed to form blood clots is missing or reduced.
In July 1999, Ashtyn was a patient of orthopedist Dr. J. Ollie Edmunds, who recommended that Ashtyn have an arthroscopic synovectomy of his right knee. |2However, Ashtyn did not see Dr. Ed-munds again until June 20, 2000, when Ashtyn was having a recurrent bleed in his right knee. After having a FluoroScan of the knee performed, Dr. Edmunds noted that there were erosions in articular cartilage and marked narrowing of the joint space. Dr. Edmunds determined that Ashtyn’s condition now required an open synovectomy, and that post-operatively, Ashtyn would need a continuous passive motion device (“CPM”) of the smallest pediatric size to assist with his range of motion. The surgery was scheduled for July 10, 2000.
*727 Prior to the scheduled surgery, Dr. Ed-munds’ clinic nurse, Donna George, contacted Stephen Johnson of Rehab Technologies to request the CPM ordered by Dr. Edmunds. Nurse George further provided Mr. Johnson with Ashtyn’s height and weight, and requested a CPM for someone of Ashtyn’s proportions. Mr. Johnson indicated that he had such a machine. Although Nurse George later informed Mr. Johnson that Ashtyn would be in for a preoperative visit on July 5, 2000, should Mr. Johnson want to measure or see Ashtyn, Mr. Johnson advised that he did not need to see Ashtyn.
Ashtyn was admitted to TUHC on July 10, 2000, and Dr. Edmunds performed a right radical knee joint synovectomy — the surgical removal of a part of the synovial membrane of a synovial joint — with bone arthroplasty, which is a surgery performed to relieve pain and restore range of motion by realigning or reconstructing a joint. Mr. Johnson met Ashtyn in the recovery room following the surgery with a Phoenix Knee CPM, which had an adjustable limb length from 20 to 42 inches. Dr. Edmunds also saw Ashtyn in the recovery room, where he adjusted the CPM machine to fit Ashtyn.
IsAshtyn was attached to the CPM from the night of July 10th to July 17th. During that time, he first began to complain of pain on July 11th. He was given a morphine PCA (Patient Controlled Analgesia) for the pain that day — as ordered by orthopedic resident Dr. Jeffery Morgan— and no further complaints were made. Ashtyn further complained of pain, specifically in his groin with a passive range of motion at 85°, on July 12th, as noted by orthopedic resident Dr. Jacob Friedmann. Ms. Wansley adjusted the machine to a flexion of 60° to relieve Ashtyn. There were no further complaints of pain. Ash-tyn began physical therapy on July 13th, and while no complaints of pain were made to healthcare providers that day, therapist Margaret Huber observed that Ashtyn had trouble keeping his lower extremity in a neutral rotation, and that the CPM was hitting his groin area. Therapist Huber advised Dr. Morgan of what she observed and he, in turn, ordered that the CPM could be left off during the day for physical therapy. Therapist Huber requested the medical team visually assess the CPM prior to night-time use.
On July 14th, Dr. Morgan noted that use of the CPM was not ideal; however, Ash-tyn did not complain of pain from the CPM that day. Furthermore, Ashtyn did not use the CPM all day either. Ms. Wansley removed the CPM prior to 7:30 a.m., on July 15th. Dr. Edmunds noted on that day that the CPM was too large even though it was the smallest available, and that an extension Dynasplint needed to be used to get more extension. Ashtyn was observed wearing the CPM that night, but a nurse later removed it at the request of Ms. Wansley. There is no note of Ashtyn being in pain on that day.
On July 16th, a nurse noted that in addition to the CPM being too big, Ashtyn was not using the CPM properly. Ashtyn was in pain with the range of motion on the CPM; thus, Dr. Edmunds adjusted Ashtyn in the CPM and also adjusted the 14ranSe °f motion on the CPM. Additionally, a physical therapy assistant noted that Ashtyn was having more pain that day secondary to drain removal, and that the pain was hindering his range of motion. The assistant further noted that the CPM was ineffective secondary to it being a poor fit.
July 17th, there were no complaints of pain made by Ashtyn. He had physical therapy at his bedside. Dr. Adams ordered a Dynasplint to assist with increasing extension in Ashtyn’s right knee. A *728 Dynasplint is a splint used to increase range of motion rehabilitation. Dr. Ed-munds documented that the CPM was ill-fitted, and that the desired flexion and extension planned for the knee post-opera-tively was not achieved.
The CPM was eventually removed on or about July 17, 2000, and Ashtyn was discharged the following day. On July 24, 2000, he was later readmitted by Dr. Ed-munds for a closed manipulation of the right knee with long leg splinting and aspiration of his knee joint. The long leg splint was removed by Dr. Edmunds on August 1, 2000. X-rays of the knee showed that it was in almost full extension with about a 5-degree flexion contracture and a large anterior joint effusion most likely representing hemarthrosis, which is bleeding in a joint.
The Appellants lodged medical malpractice claims against Dr. Edmunds and TUHC, respectively, with the State of Louisiana, Patient’s Compensation Fund in PFC Number 2001-01810. A medical review panel was impanelled, and opined, in two separate opinions, that the evidence neither supported the conclusion that Dr. Edmunds deviated from the standard of care, nor that TUHC failed to comply with the appropriate standard of care. Additionally, the Appellants filed a malpractice claim with the State Medical Review Panel, which opined that the evidence did not support the conclusion that the State of Louisiana and Department of Health and | .^Hospitals deviated from the standard of care. Thereafter, the Appellants filed their respective petitions for damages against the following entities and persons:
July 2001 — ABC Insurance Company, Rehab Technologies, Inc. and Stephen Johnson;
August 2003 — TUHC, Health Care Indemnity, Inc., the Administrators of the Tulane Education Fund d/b/a/ Tulane School of Medicine; and
January 2004 — the State of Louisiana, Department of Health and Hospitals, individually and principle of and vicariously liable for the faults of Dr. Edmund, TUHC and Rehab Technologies.
TUHC later filed a Motion for Summary Judgment In November 2010, arguing that the Appellants could not succeed in their medical malpractice suit because they did not have an expert to testify as to the standards of care owed, Nor that TUHC breached the standards of care. After argument and review of briefs, the district court granted the motion for summary judgment and dismissed the Appellants’ case against TUHC with prejudice in January of 2011. The district court explained “the reason I’m granting that [motion for summary judgment] is that you [Appellants] have no expert testimony as to why the Joint Commission of Accredited Hospital Guidelines established a standard of care in a medical case.” The district court dismissed with prejudice all claims of the Appellants against University Healthcare System, LC., d/b/a Tulane Hospital and Clinic, Tulane Hospital for Children, as part of Tulane University Hospital and Clinic, and Health Care Indemnity, Inc., (“TUHC”), and reserved all claims against the remaining defendants.
The Appellants filed a Motion and Order for Devolutive Appeal, which was granted by the district court. This timely appeal followed.
The Appellants raise seven (7) issues on appeal:
|fil. The district court erred in ruling that there was no evidence of the standard of care of the Hospital where there was direct testimonial evidence of the standard of care of the Hospital by its designated representative and Vice President of *729 Quality and Medical Affairs that reasonable care by hospital personnel required that they respond to a problem in the selection or fit of postoperative rehabilitation equipment in the in-patient setting by doing whatever they can to address the problem and to go up the chain of command of the hospital administration if necessary.
2. The district court erred in failing to recognize that statutory language and jurisprudence consider the opinion of the medical review panel as expert opinion evidence.
B. The district court erred in ruling that there was no expert opinion evidence on the standard of care of the Hospital where the panel opinion stated, “Hospitals are required to follow the orders submitted by the attending physician,” and the Hospital’s designated representative admitted plainly that the Hospital for five days before the admission took no action whatsoever to fulfill the written order of the surgeon for a “CPM post-operation (pediatric size)”, and for 8 more days in the hospital postoperatively took no action whatsoever to fulfill the written order when everyone could see that the CPM was adult size and was hurting the child.
4. The district court erred in failing to recognize evidence on the standard of care of the Hospital in the testimony of expert physician Dr. Handelsman that the hospital administrators do have responsibility to respond where the equipment ordered by the surgeon is not in place in the post-surgical period, coupled with an admission by the hospital administration that they did absolutely nothing to respond to the equipment crisis for a week once the adult size machine was put on the child in the recovery room.
5. The district court erred in failing to recognize evidence of the Hospital’s standard of care in the Standards of the Joint Commission for the Accreditation of Hospital, where the Hospital’s designated representative testified that the Hospital is accredited by such organization and that its policy is to follow such Standards.
|76. The district court erred in failing to recognize that a jury does not need an expert to understand that an administrative error such as obtaining the wrong size equipment is negligence, where the pediatric size CPM was ordered by the physician (thereby defining the Hospital’s duty), and an expert testified that the CPM was critical.
7. The district court erred, apparently believing that testimony is required from an expert physician saying the hospital breached the standard of care, when in fact the law provides a general duty of reasonable care by the hospital which a jury may apply as a factual issue, and the special provisions of La. R.S. 9:2794 apply only to “physicians, dentists, optometrists, or chiropractic physicians.”
Appellate court review of a summary judgment is de novo. Dominio v. Folger Coffee Co., 2005-0357 (La.App. 4 Cir. 2/15/06), 926 So.2d 16. Furthermore, a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). However, if the mov-ant will not bear the burden of proof at trial, the movant’s burden on the motion does not require him to negate all essential *730 elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. La. C.C.P. art. 966(C)(2). Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. Id.
While we recognize the arguments raised by the Appellants in support of their appeal, we pretermit discussion of same, finding that under a review of the | ¿record the Appellants cannot prevail in defeating the motion for summary judgment at issue because they cannot establish that there is a genuine issue of material fact as to whether they could meet their burden of proof in a medical malpractice suit against TUHC.
This matter involves a complex medical issue: did the post-operative use of an ill-fitting CPM exacerbate the hemophilic condition of an eight year-old boy, who had corrective surgery approximately one year after he was first advised to do so? The Appellants have to prove that the hospital owed a duty, which it breached, and, that this breach caused Ashtyn to sustain damages. The Appellants cannot meet all of these requirements.
“To prove medical malpractice, the plaintiff must show, by a preponderance of the evidence, the applicable standard of care, a breach of that standard of care by the defendants, causation and damages.” Taplin v. Lupin, 97-1058, p. 3 (La.App. 4 Cir. 10/1/97), 700 So.2d 1160, 1161 (La.Ct.App.1997)(citing Bradford v. O’Neill, 95-2449 (La.App. 4th Cir. 11/20/96), 688 So.2d 33, writ denied, 97-0803 (La.5/9/97), 693 So.2d 769. This is the four-pronged burden of proof that plaintiffs in medical malpractice suits must meet. Furthermore, we recently explained that in a medical malpractice lawsuit against a hospital, a plaintiff has the burden of showing that the hospital personnel negligently departed from the recognized standard of care afforded by hospitals in the area for the particular malady involved. Miller v. Tulane Univ. Hosp., 2009-1740, p. 5 (La.App. 4 Cir. 5/12/10), 38 So.3d 1142, 1145 (citing Dean v. Ochsner Medical Foundation Hospital, 99-466, p. 5 (La.App. 5 Cir. 11/10/99), 749 So.2d 36, 39. Lastly, our Court explained that expert testimony is necessary to establish the standard of care and whether that standard was breached, unless the negligence complained of was | flso obvious that a layperson can infer negligence without the guidance of expert testimony. Id. [Emphasis added]. Obvious examples of negligence, as set forth by the Supreme Court in Pfiffner v. Correa, 94-0992, 94-0963, 94-0924, p. 9 (La.10/17/94), 643 So.2d 1228, 1233, are fracturing a leg during an examination, amputating the wrong limb, or leaving a sponge in a patient’s body. Id.
The Appellants argue that they are not statutorily required to produce an expert to establish the standard of care owed by TUHC under the medical malpractice statute of La. R.S. 9:2794[1], which is not appli *731 cable to hospitals. While it is true that La. R.S. 9:2794 does not list hospitals therein, our jurisprudence as cited above evidences that in a suit against a hospital, an expert is required to establish negligence, unless the negligence complained of was so obvious that a layperson can infer negligence under Pfiffner.
ImThe record herein shows that Dr. Edmunds, his nurse and Mr. Johnson arranged for the CPM to arrive at the hospital. TUHC had no involvement in ordering or examining the equipment prior to surgery. Furthermore, Dr. Edmunds fitted Ashtyn with the CPM and opined that the non-pediatric CPM, produced by Mr. Johnson, would work. The hospital was neither involved in procuring the CPM for Ashtyn nor directing him to wear it. Considering that Ashtyn was already at an advanced stage of hemophilia at the time the subject surgery was performed, and that the hospital was not responsible for ordering the CPM machine and those principally charged with Ash-tyn’s care were not TUHC employees, the instant matter is not a case wherein negligence can be inferred by a layperson under Pfiffner.
Dr. John Handelsman is the only expert for the Appellants in this matter, and he did not testify as to what the standard of care was in this case. Furthermore, he did not testify that TUHC breached the standard of care, and that said breach caused Ashtyn to sustain damages. Indeed, Dr. Handelsman testified as follows:
Q. As I understood your testimony with Mr. Smith, when he asked the bottom line with respect to Tulane in your opinions, as I heard it — tell me if I’m wrong — that as you sit here today you have no opinions regarding the treatment, care and responsibilities of the hospital with regard to this patient?
A. No opinions as to what ?
Q. The care, the treatment or the responsibilities of the hospital with regard to Ashtyn Wansley?
A. I have to have some opinion. He was a patient in the hospital, so the hospital had some responsibility for him.
Q. Let me restate—
| UA. You are asking me specifically about the CPM machine, before you were talking about.
Q. Well, Mr. Smith had indicated that you haven’t rendered an opinion as to Tulane at all with respect to whether they had responsibility or not with the CPM, correct?
A. Yes, I don’t know that.
Q. So you have no opinion as to that issue correct, as you sit here today?
A. I have no knowledge, therefore, I can have no opinion.
Thus, the lack of an expert opinion establishing the standard of care owed by TUHC, and that TUHC breached the stan *732 dard of care, further precludes the Appellants from establishing that TUHC’s actions caused Ashtyn to sustain injuries, and to prove damages thereof. Albeit that the Appellants argue that they established the standard of care owed by TUHC under the national standards of the Joint Commission for the Accreditation of Hospital, they are required under Miller to provide an expert opinion as to the standard of care owed by TUHC. Consequently, the medical malpractice claim of the Appellants against TUHC is rendered indemonstrable by the Appellants inability to provide supporting expert testimony. Thus, we find that the district court did not err in granting the motion for summary judgment of TUHC because the Appellants could not sustain their burden of proof by a preponderance of the evidence.

DECREE

For the foregoing reasons, the judgment of the district court is affirmed.
AFFIRMED
BONIN, J., concurs with written reasons.

. La. R.S. 9:2794, entitled Physicians, dentists, optometrists, and chiropractic physicians; malpractice; burden of proof; jury charge; physician witness expert qualification, provides in pertinent part:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., an optometrist licensed under R.S. 37:1041 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optome *731 trists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.