852 So.2d 1097 (2003)
Eunice HUBBARD
v.
STATE of Louisiana and University Hospital.
Unice Hubbard, on Her own Behalf, and on Behalf of Her Minor Son, Curtis Hubbard
v.
State of Louisiana and University Hospital.
Nos. 2002-CA-1654, 2002-CA-2355.
Court of Appeal of Louisiana, Fourth Circuit.
August 13, 2003.
Rehearing Denied September 9, 2003.
*1099 Joseph W. Thomas, Ammon L. Miller, Jr., Law Offices of Joseph W. Thomas, New Orleans, LA, for Plaintiffs/Appellees.
Richard P. Ieyoub, Attorney General, J. Marc Vezina, Kelli M. Khalaf, G. Scott Vezina, Special Assistant Attorneys General, Vezina and Gattuso, L.L.C., Gretna, LA, for Defendants/Appellants.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III, Judge EDWIN A. LOMBARD).
PATRICIA RIVET MURRAY, Judge.
Defendants, the State of Louisiana and the Louisiana State University ["LSU"] Health Sciences Center, appeal the district court's judgment awarding damages to plaintiff, Eunice Hubbard, in this medical malpractice action. For the reasons that follow, we affirm.

FACTS AND PROCEEDINGS BELOW
Curtis Hubbard, son of plaintiff Eunice Hubbard, was born on August 23, 1995 at University Hospital, part of the LSU Health Sciences Center. He was born full term (42 weeks gestation), and weighed 5 pounds, 11 ounces. During his delivery, Curtis inhaled meconium fluid and was intubated as a precautionary measure. Because Curtis was hypoglycemic, an intravenous (IV) line was started in his right hand on the afternoon of August 23. Curtis continued receiving the IV solution until 3:00 a.m. on August 25, at which time it was temporarily stopped and restarted through the same line at 12:35 a.m. on August 26. At 8:30 a.m., approximately eight hours later, Curtis' IV was discontinued because his right hand and arm were swollen with discoloration and a burn at the IV site. At 9:00 a.m. the nursing notes indicate that Curtis' glucose level was above 450, which qualifies as severely hyperglycemic. At noon, the nursing notes indicate that the infant was lethargic and had symptoms consistent with dehydration. Forty-five minutes later, a staff physician noted that Curtis had been given the wrong IV solutionD50 (instead of D10)which contained five times the concentration of glucose as that ordered by the physician. Curtis was then transferred to the intensive care unit ["ICU"]. Two days later, a CT scan was performed on Curtis to evaluate his condition following his having been infused with the hypertonic (D50) solution for over eight hours and the resulting dehydration. The CT scan showed a possible venus thrombosis of the transverse and sagittal sinus. After spending approximately three weeks in the hospital, Curtis was discharged on September 16, 1995 with a scar on his right hand from the IV burn.
Curtis's mother, Eunice Hubbard, filed a medical malpractice complaint against the hospital and the State of Louisiana pursuant to La. R.S. 1299.39 et seq. The medical review panel reviewed the evidence and concluded: "[T]he defendants ... failed to comply with the applicable standard of care as charged in the complaint and there was damage." The basis of this conclusion was that the hospital staff's failure to follow the doctor's orders, which resulted in Curtis receiving the wrong IV solution, was a deviation from the applicable standard of care.
Following this determination, Ms. Hubbard filed a petition in civil district court against the State and the hospital. On December 1, 1997, the trial court granted the plaintiff's motion for partial summary *1100 judgment on the issue of liability. The remaining issues regarding causation and extent of damages were tried without a jury on September 17-18, 2001. On November 8, 2001, the trial court rendered judgment awarding the plaintiff a total of $455,000 in damages. In written reasons for judgment, the trial court indicated that $450,000 in general damages was compensation for the physical and mental suffering, permanent disfigurement and cognitive deficits sustained by Curtis Hubbard as a result of the defendants' malpractice, and an additional $5,000 in Lejeune damages was awarded to Ms. Hubbard for the mental suffering she sustained as a result of viewing her newborn in the hospital with third degree burns. Without further delineating the damages, the trial court noted that the main issue at trial was the level and extent of cognitive defects, if any, sustained by Curtis as a result of the malpractice. On this issue, the trial court concluded, based on the testimony of the plaintiff's witnesses, that the malpractice had caused Curtis to sustain some cognitive deficit. Specifically, the court noted that the CT scan of Curtis taken in the hospital showed an abnormality; whereas the failure of the defendants to produce a later CT scan, which their expert had testified was normal, warranted an adverse inference in favor of the plaintiff.
After the trial court denied their motion for new trial, judgment notwithstanding the verdict, or remittitur, the defendants took a suspensive appeal. On appeal, the defendants contend that the trial court erred by:
(1) Determining that Curtis Hubbard suffered cognitive deficits that were caused by defendants' malpractice;
(2) Allowing economist, Dr. Frank Martin, to testify regarding the future medical and future educational expenses of Curtis Hubbard;
(3) Awarding damages under La. Civil Code article 2315.6 (Lejeune damages); and
(4) Awarding an excessive amount of general damages.
We discuss these issues in turn.[1]

CAUSATION
The primary issue at trial was whether Curtis Hubbard suffered any cognitive deficit as a result of having been infused with the wrong IV solution as a newborn. The medical records undisputedly show that Curtis became dehydrated from the IV, and the CT scan taken shortly after the incident showed a possible thrombosis of the transverse and sagittal sinus. All experts agreed, however, that it would be impossible to determine whether Curtis had suffered any cognitive deficiencies as a result of the incident until he was approximately five years old. At the time of trial, Curtis was six years old and had undergone numerous medical and psychological evaluations, records of which were placed in evidence. Experts testifying for the plaintiff regarding Curtis' condition included clinical psychologist Dr. Beverly Houze, pediatrician Dr. Richard LeBoeuf and neuropsychologist Dr. Susan Andrews. Defendants' experts on this issue included geneticist Dr. Yves Lacassie, neuropsychologist Dr. William Black, and neurologist Dr. Patricia Cook.
Dr. Houze, a psychologist, first saw Curtis on November 13, 2000, when he was five years old, and continued to treat him through the time of trial. She tested Curtis *1101 and determined that his IQ was 63, which she stated was in the mildly mentally deficient range. She also reviewed Curtis' medical records and interviewed his mother and his teacher of three years. Dr. Houze testified that Curtis is hyperactive, highly distractible, and has definite perceptual and language problems. She diagnosed him as having a behavioral disorder accompanied by Attention Deficit Disorder with Hyperactivity, as a result of which she opined Curtis would need treatment by medication and therapy for the rest of his life. She noted that Curtis had a keloid scar on his right hand, which did not seem to bother him at his age, but she could not say whether the scar would have any negative affect on his psyche later in life. Finally, Dr. Houze stated that Curtis needs special education of a type that is currently not available in Louisiana public schools. Dr. Houze was not allowed to testify as to the cause of Curtis' problems, which was objected to by defendants as being outside her expertise.
Dr. LeBoeuf, a pediatrician who was also a member of the medical review panel, testified that in addition to containing the wrong solution, the flow rate of the IV given to Curtis was unusually high. He stated that a severely hypertonic solution such as that administered to Curtis can cause brain damage in the recipient. As a member of the panel, he believed that the thrombosis was caused by the receipt of the hypertonic solution, but that any effect upon Curtis' cognitive ability would not be able to be assessed until the child reached four to six years of age. When he subsequently learned that Curtis' IQ at the age of five was measured in the mildly deficient range, he concluded that, absent any other explanation, the low IQ was likely caused by Curtis' receipt of the wrong IV solution as an infant. Dr. LeBoeuf admitted that, prior to testifying at trial, he had not reviewed Curtis' medical records to determine whether there were other factors that could have caused or contributed to Curtis' mental deficiency.
Dr. Andrews, a neuropsychologist, stated that she was qualified to testify as to the affect of dehydration on cognitive ability. She opined that severe dehydration causes general mental retardation. In her opinion, Curtis' low IQ, which classifies him as mildly mentally retarded, was more likely than not related to the dehydration he suffered as an infant. On cross-examination, Dr. Andrews admitted that she was not aware that Curtis also had been diagnosed with the genetic disorder known as Russell-Silver syndrome or that he had been examined in the emergency room twice (in 1996 and 1997) for head trauma as a result of having fallen down stairs; nor had she reviewed Eunice Hubbard's prenatal records. Dr. Andrews opined, however, that the type of global retardation exhibited by Curtis probably would not have resulted from falling down stairs.
Testifying for the defendants, Dr. Lacassie, a pediatrician and expert in medical genetics, stated that he first saw Curtis in December of 1996 when the then one-year-old child was admitted to Children's Hospital for failure to thrive. Dr. Lacassie is Curtis' treating physician, and continued to see Curtis through the time of trial. Upon examination and testing, he diagnosed Curtis with Russell-Silver syndrome, a genetic disorder characterized by intrauterine and postnatal growth retardation, hypoglycemia, cranial facial disproportion, asymmetry of body, and a type of birthmark referred to as "café au lait." Dr. Lacassie indicated that Curtis' hypoglycemia at birth and small birth weight (5 lbs., 11 oz. at 42 weeks gestation) were consistent with this diagnosis, but acknowledged that Russell-Silver syndrome is a clinical diagnosis of exclusion, with no existing medical tests to confirm it. Dr. *1102 Lacassie stated that thirty to forty-five percent of persons diagnosed with Russell-Silver syndrome are mentally retarded. He opined that Curtis' mental retardation was most likely due to Russell-Silver syndrome. He also stated, however, that Curtis was not immune to the affects of dehydration even though he had Russell-Silver syndrome. Dr. Lacassie acknowledged that dehydration could have caused Curtis' mental retardation, although in his opinion it did not.
Dr. Black, a neuropsychologist, examined and tested Curtis and interviewed his mother, Eunice Hubbard, on July 19, 2001, when Curtis was nearly six years old. He measured Curtis' IQ at 68, but stated that unlike Dr. Andrews, he would diagnose Curtis as developmentally delayed rather than as having a cognitive disorder. When asked whether Curtis' developmental deficit was the result of dehydration, Dr. Black acknowledged that it was possible, but unlikely in his opinion. He stated his belief that Curtis' mental deficiency was primarily due to social/cultural and educational factors. Dr. Black qualified his opinion, however, by stating that the determination of what caused Curtis' mental deficiency was outside of his expertise as a neuropsychologist. Dr. Black also opined that Curtis would need good special education, which in his opinion is not available in Louisiana; he noted that Curtis had been evaluated for special education by the New Orleans public school system and had been turned down.
Defendants also presented the testimony of Dr. Cook, a neurologist, who performed a neurological exam on Curtis in July of 1996 when Curtis was nearly one year old, reviewed his medical records and interviewed Eunice Hubbard. Dr. Cook stated that although Curtis was small for his age, his neurological exam was normal, and she did not believe Curtis had any cognitive problems that were related to the IV infiltration he suffered. She did note in her report that Curtis had a borderline delay in language development and testified that he was in the low percentile of the normal bell curve as far as motor physical size, but had no gross motor abnormalities or focal neurological deficits. Dr. Cook opined that Curtis was at risk for later development of behavior abnormalities and cognitive dysfunction attributed to his low birth weight and hypoglycemia at birth, which both indicated that there may have been something wrong intrauterine.
In addition to her exam, Dr. Cook relied upon the radiology reports of two CT scans taken of Curtis, the first on August 28, 1995 and the second one month later on September 29, 1995. With regard to the first CT scan report indicating a possible venus thrombosis (which she defined as clotting of a vessel), Dr. Cook stated that she questioned the radiology report because it is not generally possible from a CT scan to tell a venus thrombosis from other small hemorrhages or infarctions that occur frequently in infants delivered vaginally; moreover, there was nothing to indicate that Curtis had suffered a stroke or seizure, which usually results from a venus thrombosis. According to the radiology report, the second CT scan was normal. This fact bolstered Dr. Cook's opinion that no thrombosis occurred because if such had occurred, she would have expected some neurological abnormalities to show up by the time the second scan was done a month later. Based upon this evidence and the results of the neurological exam she performed, Dr. Cook concluded that although dehydration such as that suffered by Curtis can cause thrombosis, which then can result in neurological damage, a thrombosis did not occur in the instant case. On cross-examination, Dr. Cook agreed that to determine whether the infusion of the hypertonic solution *1103 caused any personal neurological deficits, one would have to wait until the child was about five years old, when cognitive function can be better measured. Finally, Dr. Cook stated that neuropsychological tests such as those performed by Dr. Andrews and Dr. Black cannot properly be used to determine the cause of neuropsychological defects, only their existence.
Considering all the expert testimony, the trial court concluded that the plaintiff had proven that Curtis more likely than not had suffered cognitive defects that were caused by his having received the wrong IV solution. The defendants argue this determination is manifestly erroneous for two reasons. First, they argue that Dr. Andrews' testimony must be discounted because a neuropsychologist is not qualified to testify as to cause of a person's neurological condition, citing Standeford v. Winn Dixie of Louisiana, 96-088 (La.App. 5 Cir. 12/30/96), 688 So.2d 602, 604 (wherein a neuropsychologist was prevented from testifying as to causation). Secondly, defendants contend that the opinion of Dr. LeBoeuf must also be discounted because he did not review the entire medical file of Curtis Hubbard, and therefore limited his opinion on causation to those instances in which there is no other explanation; whereas a review of Curtis' entire medical history, such as was presented in evidence, reveals several possible causes for his low IQ besides the IV infiltration. In summary, defendants argue that the trial court committed manifest error by accepting the opinions of Drs. Andrews and LeBoeuf over those of Dr. Cook, who was the only neurologist to testify, Dr. Black, and Dr. Lacassie, Curtis' treating physician.
In a medical malpractice action, the plaintiff must establish a causal connection between the defendant's negligent treatment and the sustained injury. Tucker v. Lain, 98-2273, 01-0608, 01-0609, p. 14 (La.App. 4 Cir. 9/5/01), 798 So.2d 1041, 1049, writ denied, 2001-2715 (La.1/4/02), 805 So.2d 210 (citing La. R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991). Cause-in-fact is usually a "but for" inquiry which tests whether the injury would not have occurred but for the defendant's negligence. Id. (citing Cay v. State, DOTD, 631 So.2d 393 (La.1994). Causation is a factual determination that should not be reversed on appeal absent manifest error. Id. (citing Housley v. Cerise, 579 So.2d 973 (La.1991).
In a medical malpractice action, the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lies within the province of the trier of fact. Hunter v. Bossier Medical Center, 31,026, p. 5 (La. App.2d Cir.9/25/98), 718 So.2d 636, 640. Where medical experts express differing views, judgments and opinions, great deference is given to the factfinder's determinations, which should not be reversed on appeal unless the reviewing court concludes that no reasonable factual basis exists for them. Piro v. Chandler, 33,953, p. 4 (La.App. 2 Cir. 11/1/00), 780 So.2d 394, 397.
In the instant case, we cannot say that the trial court's finding of causation was manifestly erroneous. Even assuming that neither neuropsychologist (Dr. Andrews or Dr. Black) was qualified to testify as to the cause of Curtis' mental retardation, it was not unreasonable for the trial court to accept the opinion of Dr. LeBoeuf over that of Dr. Lacassie and Dr. Cook. Although at the time he initially rendered his opinion, Dr. LeBoeuf admitted he had not considered every aspect of Curtis' medical history that was eventually placed into evidence, he did later testify that the two incidents of Curtis having fallen down the stairs had not resulted in significant *1104 head trauma according to the medical records. The court may also have considered that Dr. Lacassie's explanation for Curtis's mental deficiency, Russell-Silver syndrome, is itself a diagnosis of exclusion. Additionally, Dr. Lacassie testified that only thirty-five to forty percent of patients with Russell Silver syndrome are mentally retarded, and that having Russell Silver syndrome would not exempt Curtis from suffering cognitive defects as a result of dehydration.
As for Dr. Cook, even though she was the only neurologist to testify, the trial court could have discredited her testimony for several reasons. Dr. Cook's only examination of Curtis took place when he was ten months old, and she admitted that Curtis' level of cognitive functioning would not be able to be determined until he was about five years old. More importantly, Dr. Cook indicated that in forming her opinion, she had relied partially on the radiology report noting a normal CT scan one month after the IV infiltration. This second CT scan, however, was never produced by defendants, which prompted the trial court to adopt a negative inference with regard to it. Defendants do not contest the correctness of this adverse inference on appeal. This inference could reasonably have cast doubt upon Dr. Cook's testimony, particularly since she clearly questioned the radiologist's interpretation of the first CT scan.
Therefore, in light of all the evidence, we cannot find that the trial court committed manifest error in determining that the defendants' malpractice caused Curtis to suffer cognitive deficits.

QUALIFICATION OF EXPERT
Defendants argue that the trial court erred by allowing economist Dr. Frank Martin to testify as to the present value of future medical care and of special education for Curtis. Defendants objected to Dr. Martin's testimony on the ground that he had no expertise in medical economics; the trial court judge overruled the objection, stating that he was admitting Dr. Martin as an expert in "economics." Dr. Martin admitted he was not a medical economist.
Dr. Martin, using figures he obtained from Dr. Houze giving a range of costs for twelve years of psychological treatment and consultation with school personnel, calculated that the present value of future medical expenses for Curtis to be $101,000. The defendants objected to this testimony at trial on the grounds that Dr. Houze did not testify, either in her deposition or at trial, as to the numbers she provided Dr. Martin, thereby preventing the defendants from cross-examining her regarding the basis for those figures. Then, based on the testimony of Dr. Andrews and Dr. Black that Curtis would need special education not available in Louisiana, Dr. Martin determined from conducting an internet search that the average tuition among five out-of-state schools offering special education for children with learning disabilities was $13,665 per year, and calculated the present value of twelve years of special education be $168, 501. The defendants objected to this testimony on the grounds that Dr. Martin admittedly did nothing to verify whether these schools offered the type of special education that Dr. Andrews and Dr. Black believed Curtis would need. Defendants now contend that the overruling of their objections was error.
The qualification of an expert witness rests within the sound discretion of the trial judge, and his determination will not be disturbed absent manifest error. Hunter v. Bossier Medical Center, supra, at p. 14, 718 So.2d at 644. In Hunter, the court stated: "Generally, the fact that a medical doctor is not a specialist in a particular field applies only to the effect *1105 on the weight to be given such testimony, not to its admissibility." Id. In that case, the appellate court held it was not error for the trial court to have allowed a general surgeon to testify as to an orthopedic procedure. By analogy, we conclude it was not manifest error for the court in the instant case to allow an economist to testify regarding medical economics. The record reflects that the trial judge was clearly aware of Dr. Martin's lack of expertise in the specific area of medical economics, and further that Dr. Martin disclosed exactly the sources of information and the method he used to arrive at his final figures. Particularly considering that this was a bench trial, we believe the trial judge was within her discretion to allow this testimony subject to her own ability to place upon it the weight it deserved. Moreover, there is no indication, either from the reasons for judgment or the judgment itself, that any portion of the general damages award is compensation for future medical expenses or special education; therefore, we are unable to tell from the record whether the trial court gave any credence to Dr. Martin's testimony. Under these circumstances, had we found error in the allowance of Dr. Martin's testimony, we would have been compelled to categorize such error as harmless.

LEJEUNE DAMAGES
Defendants contend the trial court erred by awarding Eunice Hubbard $5,000 in damages for emotional distress under Louisiana Civil Code article 2315.6, commonly referred to as Lejeune damages.[2] A trial court's decision to award damages under this article is a finding of fact that may not be disturbed in the absence of manifest error. Labouisse v. Orleans Parish School Board, 99-1684, p. 7 (La. App.4Cir.3/15/00), 757 So.2d 866, 871. In Williams v. O'Neill, 99-2575 (La.App. 4 Cir 3/13/02), 813 So.2d 548, writ denied, XXXX-XXXX (La.5/24/02), 816 So.2d 859, this court stated:
In order to recover under La. C.C. art. 2315.6, a plaintiff must establish the following elements: (1) the plaintiff "either viewed the accident or injury-causing event or came upon the accident scene soon thereafter and before substantial change occurred in the victim's condition;" (2) "the `direct' victim of the traumatic injury suffered such harm that it can reasonably be expected that one in the plaintiff's position would suffer serious mental anguish from the experience"; (3) "the plaintiff's emotion [sic] distress was reasonably foreseeable and `both severe and debilitating'"; and (4) "the plaintiff shared a close relationship to the injured person such that the plaintiff's shock was understandable."
Id. at p. 18-19, 813 So.2d at 561 (quoting DeClouet v. Orleans Parish School Board, 96-2805, p. 19 (La.App. 4 Cir. 6/3/98), 715 So.2d 69, 79).
In the instant case, defendants argue that Eunice Hubbard neither viewed the injury-causing event nor came upon it soon thereafter, and further, that plaintiff failed to establish that her distress was "severe and debilitating." Eunice Hubbard testified that initially, her baby remained in the hospital after she was discharged because he was being treated for "low sugar." While the baby was in the hospital, she visited him every day from 10:00 a.m. until 10:00 p.m., when she had to leave to catch the last bus home. The first day she noticed Curtis was crying, jumping, seemingly in pain, and his entire right arm was swollen. The next day when she arrived *1106 at the hospital, she was sent directly to ICU, where she saw that her newborn was crying with pain and she could see he was burned, at which point she exclaimed: "Lord, what's wrong with my child?" The burn was pink and black and she could tell it hurt the baby a lot, which distressed her. Ms. Hubbard testified that she was "terrified" and "hurt," and that she cried for a long time before a doctor finally told her that her newborn had suffered a third degree burn. After she questioned the doctor, he told her that there had been too much medicine in Curtis' IV and it had leaked into his tissues rather than going through his veins. At some point that day or the next, Curtis' bandages were removed and Ms. Hubbard, after obtaining a camera, took photographs that were introduced as evidence at the trial.
Defendants contend that because Ms. Hubbard arrived after Curtis had been moved to ICU, she did not view her son's injury before substantial change had occurred in his condition, as required by Williams, supra. They also contend that Ms. Hubbard's testimony alone was insufficient to establish that her emotional distress was debilitating, particularly in light of the fact that she had the presence of mind to request a camera from the hospital staff, and then to obtain one on her own when the staff failed to provide one.
We cannot find manifest error in the determination that a mother who suddenly finds her newborn in ICU with a third degree burn he suffered hours before while in the hospital meets the criterion of having come upon the injured person before substantial change occurred; although the child was being treated for the burn, substantial change could not yet have occurred in the burn itself, nor in the child's agitated condition. Moreover, although defendants complain that no one other than Ms. Hubbard herself testified as to her state of mind, there is no requirement that her testimony becorroborated. Ms. Hubbard's testimony that she was terrified and that she cried a long time before she was given any explanation for her son's condition are sufficient to provide a reasonable basis for the trial court's minimal award of $5,000 in Lejeune damages. Accordingly, we decline to disturb this award.

QUANTUM
Finally, defendants argue that the amount of general damages awarded by the trial court, $450,000, was excessive. However, defendants' entire argument with regard to quantum is based on the premise that plaintiffs are owed compensation only for Curtis' scar and the pain and suffering associated with the burn, not for any cognitive defects. Defendants cite Reichert v. Barbera, 601 So.2d 802 (La. App. 4th Cir.1992), in which this court affirmed an award of $25,000 to a five-year-old burned on his elbow and scarred permanently by an acid used to remove warts, and suggest that $25,000 is the highest award that is reasonable in the instant case. We disagree. The child in Reichert was not a newborn, and there is no indication that he spent time in ICU due to his injury.
Dr. Donald Faust, a pediatric orthopedic surgeon, testified that Curtis has permanent, irremovable scars that are cosmetic only, with no impairment of function. There was general agreement among the psychology experts who testified at trial that the scars on his Curtis' arm had not negatively affected his six-year-old psyche or self-image, but they could not predict what affect, if any, the scars would have on Curtis in the future. As for pain and suffering, Ms. Hubbard testified that the infant was crying and "jumping" with pain both the day before and shortly after the burn was discovered. Curtis remained in the hospital for approximately three *1107 weeks. Ms. Hubbard testified that upon returning home, she changed Curtis' bandages and moved his arm three times per day, and a home health nurse came regularly for six weeks to clean the wound and do physical therapy exercises with the arm; she stated that these procedures obviously hurt the baby because he cried as if in pain. According to her testimony, it took a year for the burn to completely heal.
In addition to the physical and mental suffering and permanent disfigurement attributable to the IV burn, the trial court found that Curtis Hubbard sustained some cognitive deficit as a result of defendants' malpractice, a finding we affirm. The trial court, however, made an in globo award of $450,000 without delineating what portion was intended as compensation for the cognitive deficiency.[3]
The trial court has great, even vast, discretion in the assessment of general damages. See generally, Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993). Under the circumstances, we cannot say that the trial court clearly abused this discretion or that the award is so high that it shocks the conscience. Moore v. Healthcare Elmwood, 582 So.2d 871 (La.App. 5th Cir.1991). Accordingly, we decline to disturb the trial court's award.
CONCLUSION
For the reasons stated, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] Plaintiff also contends in her appellee brief that appellants should be sanctioned for their alleged misbehavior in the trial court; however, plaintiff did not file an answer to the appeal, and in the absence of such, we decline to address this issue, as plaintiff is not entitled to any affirmative relief. La.Code Civ. Pro. art. 2133.
[2] The principles first set forth in Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La. 1990), concerning the standards for proving third-party mental anguish / emotional distress, have been codified in La.Code Civ. Art. 2315.6.
[3] The trial court awarded an additional $5,000 in Lejeune damages, making the total award 455,000.