Judge Joy Cossich Lobrano
hln this medical malpractice case, plaintiff/appellant, Ella J. Royal, on behalf of the minor children Keviyon Antoinette Mott and Tre’Juan Anthony Royal (collectively “the Royals”), appeals the January 4, 2016 judgment of the district court rendering judgment in favor of appellee, Lakeland Medical Center, LLC (“Lake-land” or the “hospital”), and its insurer, Health Care Casualty Insurance, and dismissing all of the Royals’ claims with prejudice. For the reasons that follow, we affirm.
This litigation arises from the March 31, 2003 triage of Wonica Royal, who died on April 1, 2003, from a pulmonary embolism (“PE”) after'she was discharged from the hospital. On March 31, 2003, Wonica Royal presented to the hospital emergency room, at which time that there was no nurse-at the triage desk. Instead, Dr. Juan Blanch (“Dr. Blanch”), an emergency room physician, was at the desk and 'performed the triage assessment himself. Dr. Blanch did not document in any medical record that a pulse oximetry test was performed during triage or the |2results of such test. Pulse oximetry is' a test used to measure the oxygen saturation level of the blood.[1]
The case proceeded to a medical review panel. On May 25,2005, the medical review panel found that the hospital failed to comply with the appropriate standard of care because there was no record of a pulse oximetry reading in the medical record and this testing should have been performed by the hospital, and if not by the hospital, then testing should have been ordered by Dr. Blanch. According to the panel, “[a]s to Dr. Blanch, there was no documentation on the chart, the patient’s respiratory rate was not addressed adequately, and he did hot request a pulse oximetry reading.” The panel also found that Wonica Royal’s chances of survival *826 would have been improved had a PE been diagnosed or suspected during the emergency room visit of March 31,2003.
On July 13, 2005, Ella J. Royal, in her capacity at tutrix for Wonica Royal’s children, filed a petition for damages, raising claims of medical malpractice against the hospital, its insurer, Dr, Blanch, and the Louisiana Patients’ Compensation Fund. The nurse who allegedly left the triage desk was not named as a defendant in' the lawsuit. The Royals argue that these health care providers are bound by the medical maxim “not charted, not done,” meaning that because pulse oximetry testing was not documented in Wonica Royal’s medical records, this testing was |snot done. The, Royals contend that if pulse oximetry testing had been done, the testing would have improved Wonica. Royal’s chances of survival.
The case proceeded to a bench trial before the district court, which took place over two days, March 11,2013 and December 14, 2015. At the end of the first day of trial, the Royals and the hospital reached a settlement, which was ultimately not finalized due to subsequent objection by the Royals’ undertutrix.[2] Following a lengthy dispute regarding enforcement of settlement, the second day of trial commenced more than two years later. The only remaining defendant at the time of trial was the hospital, as the Royals had settled their claims with Dr. Blanch and the Louisiana Patients’ Compensation Fund before trial.
The only witness called by the Royals during their case in chief was Ella Royal,[3] Lakeland called Dr. Blanch, Dr. Gerald Cvitanovich, and Dr. Kevin Jordan as witnesses, and each physician was tendered and accepted by the district court as an expert in emergency medicine without objection from the Royals.[4]
Dr. Blanch testified that he was not an employee of Lakeland; rather, he worked at Lakeland as an independent contractor under the Schumacher Group, which had a contract with the hospital and would in turn contract with individual physicians to provide care at the hospital.
|4On March 28, 2003, Dr. Blanch first treated Wonica Royal when she came to the emergency room at the hospital complaining of shortness of breath and fever. Dr. Blanch did not perform the triage assessment at that time, as it was done by a registered nurse who documented Woni-ca Royal’s oxygen saturation levels.
On March 31, 2003, Wonica Royal returned to the Lakeland emergency room at approximately 7:30 a.m. Dr. Blanch testified that he had an independent recollection of March 31, 2003 “[b]ecause it was an unusual day and then, of course, what happened” to Wonica Royal. Generally, Lake-land was not a busy hospital and was not busy that morning. At that time, staffing was reduced because of the hospital’s impending closure. There was only one nurse, “James,” scheduled that morning, and he and Dr. Blanch were the only two health care providers in the emergency room. James asked Dr. Blanch to monitor triage so that James could go to the hospital cafeteria to get coffee, and Dr. Blanch agreed.
Dr. Blanch was at the triage desk when Wonica Royal presented to the emergency *827 room, complaining of coughing to the point of vomiting. Dr. Blanch testified that there was a machine in triage that tested blood pressure, pulse, temperature, and oxygen saturation, and that he used this machine to perform this testing on Wonica Royal during triage.
Dr. Blanch testified that Wonica Royal’s oxygen saturation level is not included in her hospital record because Dr. Blanch did not have access to the computer at the triage desk. Dr. Blanch testified that there was no doubt in his mind that he tested her oxygen saturation level. He explained that her oxygen [^saturation level would have been greater than ninety-five percent (95%), because had it been less, Dr. Blanch’s course of treatment would have been different. He testified that, in the event of a reading below 95%, he would have ordered an arterial blood gas test. However, based on the results of her pulse oximetry test, he only ordered a blood count, chemistry count, and chest x-ray.
When James returned to triage, he became the treating nurse. Dr. Blanch did not remember seeing James take a pulse oximetry reading. Wonica Royal was administered breathing treatments and antibiotics, and was discharged from the hospital the same day in “good condition” with instructions to follow up with her primary physician in two days.
Dr. Blanch was questioned by counsel for the Royals regarding why Dr. Blanch did not include in his submission to the medical review panel that he performed pulse oximetry testing on March 31, 2003. Dr. Blanch testified that he told his attorney that he performed the pulse oximetry test, “no one asked” Dr. Blanch about the test, and he did not know what rules his attorney was bound by before the medical review panel. Dr. Blanch never spoke to the panel. He testified that he saw the written submission his lawyer prepared and presented to the panel. Dr. Blanch’s submission to the panel was not introduced into evidence at trial.
According to Dr. Blanch, the purpose of triage is to assess the severity of illness by evaluating the patient’s vital signs. Dr. Blanch testified that, typically, triage was a step before the doctor’s visit; however, a doctor can triage a patient as well as a nurse. Dr. Blanch testified that it was the hospital’s responsibility to have | fia medical provider at triage and that by having Dr. Blanch at triage, Lakeland had fulfilled that responsibility. According to Dr. Blanch, the hospital was not negligent in having no nurse at the triage desk because a health care provider, Dr. Blanch, was at the desk.
Dr. Blanch testified that it would be negligent not to do the pulse oximetry test; however, he disagreed with the panel that he was negligent by failing to record that the test was done. According to Dr. Blanch, “not charted, not done” is a saying associated with billing, admonishing health care providers to document the treatment and testing they perform, but it is not the standard of care. Dr. Blanch testified that whether the test was done is the standard of care. He stated that doctors are trained to look for what is different or abnormal about a patient’s presentation and that it is not possible to record everything. He agreed, however, that providers are held “accountable for not writing it down.” Dr. Blanch testified that his normal practice was to record the pulse oximetry results on a “T-sheet” in the appropriate slot. He did not do this during Wonica Royal’s triage because he forgot.
Dr. Blanch testified that a PE is a blood clot that develops elsewhere in the body and travels to the lungs through the bloodstream. Depending on the size of the PE, symptoms can range from nothing to catastrophic respiratory and eardio pulmonary *828 failure. Dr. Blanch testified that on March 28, 2003, Wonica Royal’s symptoms were consistent with an infection, not a PE. On March 31, 2003, her symptoms were consistent with progression of sinusitis and bronchospasm to |7bronchitis and not a PE. Dr, Blanch explained that infiltrate was present on her chest x-ray, but that this was associated with the respiratory system and not blood vessels. Dr. Blanch testified that, in his medical opinion, Woni-ca Royal did not have a PE when she was treated at the hospital on March 28 or 31, 2003.
, Based on Dr. Blanch’s review of Wonica Royal’s autopsy, Dr. Blanch’s medical opinion was that the PE, was an acute event that would not have been detectable at the time of her emergency room visit. Dr. Blanch testified that James’ absence at the time of triage did not cause or contribute to Wonica Royal’s death. He further testified that he knew Wonica Royal’s pulse oximetry test results at the time he took the test. According to Dr. Blanch, his non-recording of the test results did not cause or contribute to Wonica .Royal’s death.
Dr. Cvitanovich, who was one of the three physicians on the medical review panel, was also called as a witness by Lakeland. According to Dr. Cvitanovich’s testimony, the medical review panel’s basis for finding against the hospital was that there was insufficient triage as no pulse oximetry-was reflected in the chart. The panel concluded, because there was no pulse oximetry test reflected in the chart, that it was not done. Dr. Cvitanovich testified that, if he had known that Dr. Blanch had performed the test, then this information would háve changed his opinion as to the liability of the hospital.
According to Dr. Cvitanovich, because Dr. Blanch performed the test, Dr. Blanch was the one responsible for recording it. Dr. Cvitanovich attested that “not charted, not done” is a term in the legal community that doctors use as a teaching |stool for the premise that if something is not recorded, “people are going to assume that you didn’t do it.”.Dr, Cvitanovich testified that “not charted, not done” is not the standard of care but is associated with billing, in that it is difficult to obtain payment without documentation of treatment.
Dr. Cvitanovich stated that the .purpose of triage is to perform an initial patient assessment and .determine priority of treatment of patients. Dr. Cvitanovich read Dr. Blanch’s deposition testimony and believed Dr, Blanch’s account of the March 31,' 2003 triage, because Dr. Cvitanovich could not think of a reason for Dr. Blanch to lie. Dr. Cvitanovich found it believable that the. pulse oximetry was the one test result not recorded in triage. Dr. Cvitano-vich explained that at Lakeland, a vital sign monitor on wheels is used, which allows the person performing triage to multitask testing blood pressure, pulse oxime-try, heart rate, and temperature. If the patient is disconnected from the vital sign monitor, all the readings will remain recorded on the machine except for the pulse oximetry because the pulse oximetry is a continuing, dynamic measurement. Based on review of the autopsy report, Dr, Cvita-novich was of the opinion that Wonica Royal died from acute pulmonary embolism.
Dr. Jordan, the hospital’s expert witness in the field of emergency medicine, testified that triage is the sorting pf patients by rapid assessment to prioritize which patients should be seen first depending on the severity of illness. Traditionally, nursing staff performs triage, but Dr. Jordan has also triaged patients. Dr. Jordan was familiar with the vital sign monitor used by Dr. Blanch in triage and agreed Lwith Dr. Cvitanovich’s testimony that, if the patient *829 is removed from the machine, the pulse oximetry reading disappears. Dr. Jordan agreed with Dr. Blanch’s testimony that, based on a normal pulse oximetry reading, there was a particular pathway of treatment that would follow, and based on Won-ica Royal’s treatment, it was likely that her. pulse oximetry reading at triage was normal.
Dr. Jordan described the saying “not charted, not done” as an axiom or admonition in physicians’ training about the importance of documentation. He testified that the saying is not related to whether certain testing or treatment was actually done.
On rebuttal, the Royals called Dr. Gerald Liuzza, who was tendered and accepted as an expert in forensic pathology without objection. Dr. Liuzza testified that, based on his review of Wonica Royal’s autopsy, if at the time of the emergency room visit the pulmonary emboli were in the same condition as they appeared at the time of autopsy, then it was likely that the pulse oximetry results in the emergency room would have been abnormally low. Dr. Liuz-za testified that Wonica Royal’s chances of survival would have been somewhat improved had pulse oximetry testing been done.
Dr. Liuzza testified that he was trained as a physician to document all significant medical information. He was unwilling to state that testing was not done, simply because it was not recorded; however, he would have to be shown “some other good evidence to state that it in fact was.”
I inThe hospital objected to subsequent questioning by the Royals regarding whether Dr. Liuzza considered “not charted, not done” the standard of care. The district court sustained the objection, and the Royals proffered Dr. Liuzza’s testimony that “not charted, not done” is the standard to which health care providers adhere.
On January 4, 2016, the district court rendered judgment dismissing the Royals’ claims with prejudice. The district court provided written reasons for judgment, in relevant part, finding that: the Royals failed to show that the hospital owed a duty to perform and document the pulse oximetry testing on arrival; Dr. Blanch assumed the duty to cover the triage desk during the time he treated Wonica Royal; Dr. Blanch was an independent contractor and not an employee of the hospital; and any negligence by Dr. Blanch, a non-employee, cannot be imputed to the hospital.
The Royals appealed, arguing that the district court erred as follows:
1. in concluding that Dr. Blanch performed and recorded a pulse oxime-try test on Wonica Royal on March 31, 2003;
2. in concluding that Dr. Blanch’s testimony overcame the fact that neither Lakeland nor Dr. Blanch properly documented said oximetry reading on the chart;
3. in concluding that Lakeland did not owe a duty to Wonica Royal to perform and document a pulse oximetry test upon arrival; and
4. in dismissing the Royals’ claims.[5]
lnRegarding the standard of review on appeal, the Royals contend that the district court’s findings of fact are subject to de novo review because the district judge who rendered judgment did not preside over the first day of trial. Thus, according to the Royals’ argument, the dis *830 trict court’s findings of fact should not be afforded the same level of deference they would as if the same judge had presided over the entire trial and heard all testimony in person. We disagree. The Louisiana Supreme Court rejected this argument in Shephard on Behalf of Shepard v. Scheeler, 96-1690, pp. 14-15 (La. 10/21/97), 701 So.2d 1308, 1316-17, where the district judge who presided over the trial and observed demeanor evidence died prior to rendering judgment. Even though a different district judge decided the matter, the Supreme Court found “that the proper allocation of trial and appellate functions between the respective courts are better served by the heightened standard of manifest error review.” Id., 96-1690 at p. 15, 701 So.2d at 1317.
Whether alleged malpractice constitutes negligence is a question for the factfinder; thus, the manifest error rule applies to findings of fact in medical malpractice actions. Stamps v. Dunham, 2007-0095, p. 4 (La. App. 4 Cir. 9/19/07), 968 So.2d 739, 743.
A court of appeal may not set aside the [factfinder’s] finding of fact in absence of “manifest error” or unless it is “clearly wrong.” Stobart v. State through DOTD, 617 So.2d 880 (La. 4/12/1993), citing Rosell v. ESCO, 549 So.2d 840 (La. 1989). The Louisiana Supreme Court has provided a two-prong test for the reversal of a factfinder’s determinations: (1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart, citing Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). The issue to be resolved by the reviewing court is not whether | iathe trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Id.
Id., 2007-0095 at p. 3, 968 So.2d at 742-43.
This Court explained the burdens of proof applicable to medical malpractice actions against hospitals in Wansley ex rel. Wansley v. ABC Ins. Co., 2011-0592, pp. 8-9 (La. App. 4 Cir. 11/16/11), 81 So.3d 725, 730 as follows:
“To prove medical malpractice, the plaintiff must show, by a preponderance of the evidence, the applicable standard of care, a breach of that standard of care by the defendants, causation and damages.” Taplin v. Lupin, 97-1058, p. 3 (La. App. 4 Cir. 10/1/97), 700 So.2d 1160, 1161 (La. Ct. App. 1997)(citing Bradford v. O’Neill, 95-2449 (La. App. 4th Cir. 11/20/96), 688 So.2d 33, writ denied, 97-0803 (La. 5/9/97), 693 So.2d 769. This is the four-pronged burden of proof that plaintiffs in medical malpractice suits must meet. Furthermore, we recently explained that in a medical malpractice lawsuit against a hospital, a plaintiff has the burden of showing that the hospital personnel negligently departed from the recognized standard of care afforded by hospitals in the area for the particular malady involved. Miller v. Tulane Univ. Hosp., 2009-1740, p. 5 (La. App. 4 Cir. 5/12/10), 38 So.3d 1142, 1145 (citing Dean v. Ochsner Medical Foundation Hospital, 99-466, p. 5 (La. App. 5 Cir. 11/10/99), 749 So.2d 36, 39. Lastly, our Court explained that expert testimony is necessary to establish the standard of care and whether that standard was breached, unless the negligence complained of was so obvious that a layperson can infer negligence without the guidance of expert testimony. Id. [Emphasis added]. Obvious examples of negligence, as set forth by the Supreme Court in Pfiffner v. Correa, 94-0992, 94- *831 0963, 94-0924, p. 9 (La. 10/17/94), 643 So.2d 1228, 1233, are fracturing a leg during an examination, amputating the wrong limb, or leaving a sponge in a patient’s body. Id.
Where expert witnesses disagree as to the standard of care, the factfinder’s determination is given a great deal of deference. McCarter v. Lawton, 2009-1508, pp. 4-5 (La. App. 4 Cir. 7/21/10), 44 So.3d 342, 347. “The determination of an expert’s credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review.” Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1277 (La. 1991). “The expert’s qualifications and 1 ^experience, as well as the facts, determine the weight to be given the expert’s testimony.” Descant v. Administrators of Tulane Educ. Fund, 95-2127, p. 16 (La. App. 4 Cir. 1/21/98), 706 So.2d 618, 628. “When a factfinder chooses between or among competing opinions of expert witnesses, we almost never find manifest error in that choice.” McCarter, 2009-1508 at p. 5, 44 So.3d at 347.
“In a medical malpractice action, the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lies within the province of the trier of fact.” Hubbard v. State, 2002-1654, p. 11 (La. App. 4 Cir. 8/13/03), 852 So.2d 1097, 1103. “Where medical experts express differing views, judgments and opinions, great deference is given to the factfinder’s determinations, which should not be reversed on appeal unless the reviewing court concludes that no reasonable factual basis exists ' for them.” Id. “If the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Madison v. Ernest N. Morial Convention Center-New Orleans, 2000-1929, pp. 18-19 (La. App. 4 Cir. 12/4/02), 834 So.2d 578, 590.
In this appeal, the Royals raise three main arguments: (1) that Dr. Blanch was not credible; (2) that the district court failed to apply the appropriate standard of care; and (3) that the hospital should have been precluded from raising a defense at trial that was not considered by the medical review panel.
| uRegarding Dr. Blanch’s credibility, the Royals contend that Dr. Blanch’s trial testimony is inconsistent with his position before the medical review panel, where he failed to indicate that he performed the pulse oximetry test. The Royals argue that the first time that Dr. Blanch claimed that he performed the pulse oximetry test was in his 2011 deposition, six years after the panel rendered its decision. According to the Royals’ argument, Dr. Blanch’s testimony also conflicts with the medical records dated March 31, 2003, which do not reflect a pulse oximetry reading. The Royals also contend that Dr. Blanch was motivated.to give false testimony-to clear his name because he disagreed with the medical review panel’s decision.
Lakeland argues that the district court had no need to'weigh Dr. Blanch’s testimony that he performed the pulsé oximetry test but failed to document it, because there was no countervailing evidence refuting this testimony. The hospital also contends that the district court was not manifestly erroneous in weighing Dr. Blanch’s testimony against the medical review panel’s findings and crediting more weight to Dr. Blanch’s testimony.
Dr. Blanch’s submission to the medical review panel was not introduced into evidence at trial and is not a part of the record before this Court. We are thus *832 unable to review it. Nevertheless, Dr. Blanch testified that his submission to the medical review panel was prepared by his attorney, that he reviewed the submission prepared by his attorney, that he informed his attorney that he had performed the pulse oximetry test, and that he never spoke to the panel about the |1flclaims against him. It is undisputed that Dr. Blanch did not document that a pulse oximetry test was performed or any corresponding test results in the pertinent medical records, Nevertheless, Dr. Blanch testified to his recollection of his encounter with Wonica Royal and described his use of a vital sign monitor during triage to perform multiple patient intake tests at once, including pulse oximetry. Drs. Cvita-novich and Jordan testified as to their familiarity with the vital sign monitor and explained the mechanism by which it records other results, while not maintaining the pulse oximetry reading once the patient is removed from the machine. Dr. Jordan also testified that Dr. Blanch’s treatment on March 31, 2003, was consistent with a normal pulse oximetry reading.
The determination of an expert’s credibility and the assessment of contradictory testimony of expert witnesses are factual questions to be resolved by the factfinder. Hubbard, 2002-1654 at p. 11, 852 So.2d at 1103. Great deference is afforded factfinder’s determinations, which should not be reversed on appeal unless the reviewing court concludes that no reasonable factual basis exists for those determinations. Id. Dr. Blanch was tendered and accepted as an expert witness without objection. The district court was tasked with evaluating his credibility when considered alongside the medical review panel decision and the testimony of the other expert witnesses. Considering the evidence of record, we cannot say that the district court’s finding, that Dr. Blanch performed the pulse oxi-metry test but failed to record it, was clearly wrong.
|1f,Next, the Royals argue that the district court failed to apply the following standards of care to this claim: (1) “not charted, not done” and (2) duty to have a nurse at the triage desk.
First, the Royals maintain that the district court should have followed the maxim “not charted, not done” to find that, because pulse oximetry testing was not documented in Royal’s medical records, this testing was not done. The Royals cite to Smith v. State Through Dep’t of Health & Human Res., 517 So.2d 1072, 1076 (La. App. 3 Cir. 1987), writ granted, 519 So.2d 107 (La. 1987), and aff'd sub nom. Smith v. State through Dep’t of Health & Human Res. Admin., 523 So.2d 815 (La. 1988), in which the Louisiana Third Circuit Court of Appeal refers to expert testimony using the phrase “not charted, not done.” The Smith court concluded that a patient was insufficiently monitored by hospital staff, relying on a lack of documentation of care and physician testimony that EKG testing should have been performed sooner. Id. However, the Smith case does not equate the phrase “not charted, not done” with the standard of care; rather, the court interpreted the evidence that the “nurses did not specifically recall the patient, and thus the best evidence of their actions would have been the documentation on the chart.” Id.[6]
We find no reported case that equates the phrase “not charted, not done” with the standard of care. None of the expert witnesses testified at trial that this maxim *833 is the standard of care for any health care provider. Drs. Blanch and 117Cvitanovich both testified that “not charted, not done” is not the standard of care. Dr. Jordan testified that the phrase “not charted, not done” is unrelated to whether certain medical testing was actually done. The statements by Dr. Liuzza, agreeing with the Royals’ counsel that this maxim is a “standard by which healthcare providers conduct themselves,” were proffered and not considered by the fact finder at trial. The Royals did not raise the exclusion of this testimony as error, and we do not consider the proffered testimony here. Moreover, we decline to interpret a doctor’s lapse in documentation of testing as absolutely conclusive that the testing was not done. The Royals cite to no law, and we find none, that permits us to follow such a standard.
Second, the Royals argue that Lakeland was negligent because its nurse left the triage desk and entrusted triage to Dr. Blanch. According to the Royals’ argument, the hospital had a duty to staff a nurse at the triage desk, and the hospital breached that duty. Under the facts of this case, we find the Royals’ argument unsupported by the expert testimony or the laws of this State. Dr. Blanch testified that the hospital’s responsibility was to have a medical provider at the triage desk and that the hospital fulfilled its responsibility by having Dr. Blanch at the desk. Drs. Cvita-novich and Jordan testified that the purpose of triage is to assess and sort patients in such a manner to treat the most urgent conditions earliest. Drs. Blanch and Jordan testified that while a nurse typically’ performs triage assessments, a doctor can also triage a patient. There was no evidence to refute this testimony. Further, we have identified no statute or jurisprudence of this State prohibiting a |1snurse from delegating his or her triage duty to a doctor. The Royals’ arguments lack merit.
Finally, the Royals argue that the hospital should have been barred from raising its “autopsy defense” at trial. When questioning Drs. Blanch and Cvitanovich, counsel for the hospital sought to elicit medical opinion testimony that, based on Dr. Blanch’s and Dr. Cvitanovich’s review of the autopsy, Wonica Royal’s PE was an acute event that would not have been detectable at the time of her emergency room visit. According to the Royals’ argument, this issue was not presented to the medical review panel and was therefore an improper defense at trial.
None of the submissions to the medical review panel were admitted into evidence at trial, and accordingly they are not part of the record on appeal. The Royals cite to no law, and we find none, to support the Royals’ argument that Dr. Blanch’s and Dr. Cvitanovich’s testimony regarding the autopsy was not properly before the lower court. This argument is without merit.
Accordingly, for the reasons stated above, we affirm the January 4, 2016 judgment of the district court.
AFFIRMED

. "Pulse Oximetry” (May 22, 2017), available at http://www.hopkinsmedicine.org/health library/test_procedures/pulmonary/oximetry_ 92,P07754/. See La. C.E. art. 201(B)(2). See also La. R.S. 40:1083.1(D) (" ‘Pulse Oximetry Screening’ means a noninvasive test that estimates the percentage of hemoglobin in blood that is saturated with oxygen...")

. See Royal v. Blanch, 2014-0711 (La. App. 4 Cir. 9/5/14), on reh’g (10/6/14) (unpub.).

, Ella Royal testified as a fact witness regarding her knowledge of Wonica Royal’s death and the damages sustained by Wonica Royal’s children. She was not tendered as an expert witness and did not provide any medical testimony.

.Dr. Blanch was also accepted as an expert in the field of internal medicine.

. The Royals do not raise Dr, Blanch's independent contractor status or vicarious liability of the hospital on appeal.

. The Royals also cite to Williams v. Dauterive Hosp., 771 So.2d 763, 766-767 (La. App. 3 Cir. 2000) for the proposition of "not charted, not done.” However, we find no reference to that phrase in Williams; thus, the Royals’ reliance on that case is misplaced.